UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SHAWN ARMSTRONG, | ) | Case No. 4:08CV1160 |
| | ) | |
| Plaintiff, | ) | Judge Peter C. Economus |
| | ) | |
| vs. | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF MAGISTRATE JUDGE** |
| DENNIS WATKINS, ET AL. | ) | (Resolving ECF #22) |
| | ) | |
| Defendants | ) | Magistrate Judge James S. Gallas |
| | ) | |

Defendants, Dennis Watkins, and Trumbull County, Ohio, have moved for summary judgment in this matter seeking dismissal of Plaintiff, Shawn Armstrong's complaint. (Docket #22). Mr. Armstrong filed his complaint *pro se* against Trumbull County Prosecutor, Mr. Watkins, and Trumbull County, Ohio,[1] pursuant to 42 U.S.C. §1983, 42 U.S.C. §1985, and alleging claims for aiding and abetting, and malicious prosecution, pursuant to Ohio State law. (Docket #1). Mr. Armstrong was convicted of one count of aggravated murder for the death of Brad McMillan, which conviction was reversed based on the trial court's erroneous admission of witness Art Bell's unsworn statement. *See State v. Armstrong*, 2004 WL 2376467 (Ohio App. 11 Dist.) ("*Armstrong I*"). Mr. Armstrong alleges that his rights were violated when "[d]efendants engaged in a pattern of activity and course of conduct that was intended to manufacture" his conviction. (Docket #1 at ¶44). Specifically, Mr. Armstrong asserts that "Defendants knew or should have known that the alleged

---

[1] Defendants John Mandopoulos (City of Warren Ohio Police Chief), Donald Bishop (Warren Township Police lieutenant), City of Warren, Ohio, Melanie Gambill (City of Warren Police Department detective), and John Does 1 - 4 were dismissed without prejudice due to a service of process issue pursuant to Rule 4(m). (Docket #15, #19).

2

statements of Art Bell that implicated [him] in the murder were false and that it [sic] was the result of a coercive custodial interrogation[.]" (Docket #1 at ¶38).

Defendants filed their motion for summary judgment on January 15, 2009, and served the motion on Mr. Armstrong electronically and by regular U.S. Mail. (Docket #22). Mr. Armstrong has not responded.

I.     **FACTUAL AND PROCEDURAL BACKGROUND**

The facts of the criminal case that form the basis of Mr. Armstrong's complaint, and which were cited by Defendants in support of their unopposed motion for summary judgment, were set forth in *Armstrong I, ¶¶*2-20:

> On the evening of August 9, 1998, the victim, Brad McMillan ("McMillan"), and his sister, Tracy Robinson ("Robinson"), visited the Elk's Lodge in Warren Township, Ohio. Robinson was initially hesitant in allowing McMillan to go out because McMillan had previously served as a confidential informant for the Trumbull County Drug Task Force and was scheduled to give testimony in an upcoming drug trafficking case. Ultimately, McMillan persuaded Robinson to join him for a night out at the Elk's Lodge.
>
> The Elk's Lodge was located at 1919 Highland Avenue. Immediately adjacent and to the south of the Elk's Lodge was Cliff's Lounge. These two properties were separated by a small grass median. To the east and behind Cliff's Lounge was a small wooded area. Two blocks south of the Elk's Lodge was the Monument of Faith Church, which was positioned on the corner of Highland Avenue and Miller Street.
>
> While Robinson and McMillan were inside the Elk's Lodge, McMillan was informed that an unidentified man wanted to see him in the parking lot. McMillan left Robinson and went outside to the parking lot.
>
> Shortly after McMillan had left the club, Robinson went outside to check on him. Robinson found McMillan's body in the driver's seat of his car. He was dead with a bullet wound to the back of the head. Robinson immediately ran back into the Elk's Lodge and called 911 for emergency assistance.
>
> Sergeant Edward Anthony ("Sgt.Anthony"), of the Warren Township Police Department, was patrolling the area near the Elk's Lodge on the night of the shooting. As he drove eastbound onto Miller Street, Sgt. Anthony noticed an

occupied burgundy Pontiac that was parked with its lights off at the Monument of Faith Church parking lot. He watched the suspicious vehicle turn on its headlights and make a right turn northbound on Highland Avenue. Sgt. Anthony followed the Pontiac by turning right on Highland Avenue and radioed in the vehicle's license plate number. The Pontiac then turned into the parking lot of Cliff's Lounge. Sgt. Anthony continued northbound on Highland Avenue, still trying to obtain information on the suspicious vehicle. Before he obtained any information, he received a dispatch that a shooting had occurred at the Elk's Lodge.

A short time later, Patrolman Michael Merritt ("Ptlm.Merritt") arrived at the crime scene with Skyler, a trained tracking dog. After speaking briefly with Sgt. Anthony, Ptlm. Merritt checked the scene for contamination and then gave the command to search. Once Skyler came to the back of the deceased's vehicle, he detected a fresh track and began to follow it. Skyler first headed east toward the wooded area behind Cliff's Lounge and then proceeded south. Eventually, Skyler ended his track at the Monument of Faith Church parking lot.

Warren Township Police Lieutenant, Donald Bishop ("Lt.Bishop"), began the investigation by following up on the suspicious burgundy Pontiac which had been previously spotted in the church parking lot. Lt. Bishop learned that the burgundy Pontiac belonged to Ronald Peterson ("Peterson"), a Youngstown City police officer. Further investigation revealed that appellant had been staying at Peterson's home in Youngstown, Ohio, while Peterson was living with his parents in Warren. On August 10, 1998, appellant agreed to give a voluntary statement to Lt. Bishop.

In his statement, appellant explained that he had borrowed Peterson's car on the night of the homicide to visit his own family in Warren. Appellant stated that he went to the Elk's Lodge around midnight, but did not enter the club due to the entrance fee. Instead, appellant parked the car at Cliff's Lounge and began to roll a joint of marijuana. Appellant was about to smoke the joint when a man passing by informed him that there were undercover police officers nearby.

At this time, appellant maintained that he drove Peterson's car to the Monument of Faith Church parking lot and started to smoke marijuana. Appellant acknowledged that he saw a police car heading eastbound down Miller Street towards Highland Avenue. Appellant then stated that he exited the church parking lot and drove northbound on Highland Avenue with the police officer directly behind him. He further explained that he took a right turn into the Elk's Lodge parking lot and the police officer continued northbound on Highland Avenue. Appellant asserted that when he pulled into the Elk's Lodge he heard someone scream, "Brad is dead." Without exiting the car, he claimed he then drove to the back of the club and drove out of the parking lot.

4

Lt. Bishop continued his investigation by questioning Peterson and receiving his consent to search and tow his Pontiac. Peterson also surrendered an empty gun box that contained .45 caliber Speer Lawman ammunition. A casing recovered from the front seat of the victim's car matched this caliber and brand of ammunition. Lt. Bishop further discovered that on August 12, 1998, three days after the homicide, Peterson reported to the Youngstown City Police Department that his .45 caliber automatic pistol had been stolen from his residence.

During the pendency of the investigation, Lance Pough ("Pough"), the individual against whom McMillan had been scheduled to testify as a confidential informant, and Pough's friend, Art Bell, were already incarcerated due to federal drug trafficking charges. While incarcerated, both Pough and Art Bell entered into various agreements with the prosecution relating to the McMillan homicide investigation. Pough and Art Bell provided Detective Melanie Gambill ("Det.Gambill"), of the Warren City Police Department, with information regarding the murder. Specifically, Art Bell provided Det. Gambill with unsworn, out-of-court statements as part of his agreement, in which he confessed to his participation in the planning of the McMillan homicide. His statements also inculpated appellant as part of this murder-for-hire scheme. Ultimately, prior to appellant's trial, Art Bell was convicted in state court for his role in the McMillan homicide.

Thereafter, the investigation effectively stalled until March 30, 2000, when an Austintown police patrolman stopped the car of Edrick Davis ("Davis") and observed a round of ammunition and a clip in plain view. The patrolman investigated and found a gun next to the clip. The gun was later identified as Peterson's missing weapon. Further evidence was gathered which ultimately linked appellant to the gun that was found in Davis' car.

On May 9, 2000, appellant was indicted for one count of aggravated murder with specifications of aggravated circumstances and a firearm specification, in violation of R.C. 2903.01(A), R.C. 2929.04(A)(8), and R.C. 2941.145. Appellant was also indicted on one count of conspiracy to commit aggravated murder with a firearm specification, in violation of R.C. 2923.01(A)(1) and 2941.145. Before trial, the prosecution nolled the aggravated circumstances, and the trial court dismissed the conspiracy charge. As a result, appellant proceeded to a trial by jury on September 18, 2001, for one count of aggravated murder with a firearm specification.

During trial, Pough and Art Bell testified as to their involvement with the homicide. Pough testified that he had agreed to pay Carlo Eggleston ("Eggleston") $14,000 to have McMillan killed because McMillan was going to testify against Pough in a drug trafficking case. Eggelston was also a police officer with the Youngstown City Police Department and had been Peterson's partner. Pough testified that he had paid Eggleston $6,700 while in Art Bell's garage. Pough further stated he had given Eggleston the $6,700 that day, but knew none of the details surrounding the murder

5

because, as he testified, "it was irrelevant to me really." Pough then testified that after Art Bell informed him of McMillan's death, Pough instructed Art Bell to "give the money to whoever is over there."

During his direct and cross-examination, Art Bell developed memory problems concerning his previous unsworn statements to Det. Gambill. As a result of Art Bell's lack of recollection, the prosecutor read aloud a series of statements, previously made to Det. Gambill, by Art Bell. In those unsworn statements, Art Bell confessed to his own role in the murder-for-hire scheme and inculpated appellant. After each incriminating statement was read, Art Bell testified that he did not remember making the statements. At no time did he acknowledge or deny the substance of those statements.

Kendra Bell, Art Bell's sister, testified that appellant visited the Bell family home on the day after the murder. Although she did not see any exchange of money, Kendra Bell testified that, at that time, Art Bell was there with an undisclosed amount of money.

In relationship to the gun, the following convoluted trail of evidence was laid. Vincent Thomas ("Thomas"), a resident of the Westlake Housing Project in Youngstown, testified that, after the murder, Josh Miller ("Miller") had approached him at his apartment in an attempt to purchase a gun. Thomas told Miller that he was not going to sell him a gun. At this time, a man outside of Thomas' apartment door approached Miller from behind and informed Miller that he had a gun for sale. Thomas then shut the door of his apartment. Lt. Bishop contacted Thomas and asked him to identify the man who approached Miller from an eight-man photo array. Thomas selected appellant's picture as the man who approached Miller regarding a gun for sale.

Additional testimony at trial established that, subsequent to McMillan's death, Miller had come into possession of the .45 caliber revolver used in the murder. He ultimately sold the gun to Darrin Lane ("Lane"). Lane then sold it to Darryl Cooper ("Cooper"). Cooper sold the weapon to Davis, who was ultimately pulled over by the Austintown patrolman. Firearms expert, Michael Roberts ("Mr.Roberts"), testified that a bullet fragment recovered from McMillan's skull matched a bullet that was discharged from the .45 caliber revolver recovered from Davis' vehicle.

Following the close of the case, the jury found appellant guilty of one count of aggravated murder, in violation of R.C. 2903.01(A), with a firearm specification, in violation of R.C. 2941.145. Appellant was sentenced to a prison term of twenty-three years to life.

6

Mr. Armstrong appealed his conviction.  (*Id.* at ¶23).  On October 24, 2004, the Court of Appeals of Ohio, Eleventh District, reversed Mr. Armstrong's conviction "on the basis that Bell's unsworn statement was improperly admitted into evidence at trial." (Docket #22 at 6-7; *see also*, *Armstrong I* at ¶¶123, 125).  Subsequent to the reversal, Trumbull County Assistant Prosecutor, David Toepfer "began preparations for a second murder trial of Mr. Armstrong."  (Docket #26, Affidavit of David M. Toepfer at ¶15).  Mr. Armstrong was not immediately tried for murder "due to the fact that Mr. Armstrong obtained new legal counsel, *** who proceeded to file numerous motions, including several motions to continue and a motion for extension of time" and "due to the fact that the State of Ohio appealed [*Armstrong I*] to the Supreme Court of Ohio." (*Id*. at ¶¶18-19). On May 12, 2006, the State "filed a motion dismissing all charges against Mr. Armstrong" and "[o]n May 15, 2006, Mr. Armstrong was released." (*Id.* at ¶16).  On May 9, 2008, Mr. Armstrong filed the instant action.

II.  **LAW AND ANALYSIS**

Under Rule 56 of the Federal Rules of Civil Procedure, granting a motion for summary judgment is only proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  In determining whether there is a genuine issue of material fact, all inferences drawn from the underlying facts contained in affidavits, pleadings, responses to discovery requests, and depositions must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587-88 (1986); *United States v. Diebold, Inc.*, 369 U.S.654 (1962).  A court must inquire "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

7

The court may not make credibility determinations or weigh the evidence when ruling on a motion for summary judgment. *Anderson*, 477 U.S. at 255. The burden is upon the movant to demonstrate the absence of a genuine issue of material fact. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir. 1979), *cert. dismissed* 444 U.S. 986 (1979). However, the nonmoving party is obliged to produce some evidence other than the pleadings to demonstrate that there is a genuine issue for trial. *Celotex Corporation v. Catrett*, 477 U.S. 317, 324 (1986). The nonmoving party must produce significant probative evidence in support of the complaint to defeat the motion for summary judgment through affidavits or admissions on file. *Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 339-40 (6th Cir. 1993). In the final analysis, "the threshold inquiry . . . [is] whether there is a need for trial -- whether in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250; *Moore*, 8 F.3d at 340. Once the nonmoving party has responded , the court must view the facts in the light most favorable to the nonmoving party. *Darrah v. City of Oak Park,* 255 F.3d 301, 304 (6th Cir. 2001).

      **1.**      **The 42 U.S.C. §1983 Claim**

In his complaint, Mr. Armstrong alleges that the following conduct by Warren County Prosecutor, Mr. Watkins, [2] was intended to manufacture his conviction and violated his Fourth, Fifth, and Fourteenth Amendment rights: (1) submission of false statements to a grand jury "in order to get [Mr.] Armstrong indicted on the charge of murder"; (2) arrest of Mr. Armstrong based on the

---

[2] Only one of the incidents of conduct was specifically alleged against Mr. Watkins. However, the Court will also consider the other incidents to be alleged against Mr. Watkins to the extent they do not name any specific defendant. In his first claim, Mr. Armstrong makes no allegations specific to defendant Trumbull County.

8

unreasonable belief that the false statement constituted probable cause; and (3) charging of Mr. Armstrong with a crime he knew, or should have known, Mr. Armstrong did not commit. (Docket #1 at ¶45). Mr. Armstrong further alleges that Watkins is a maker of official policy in Trumbull County and, thus, his actions "constitute the official policy of" his governmental employer. (Docket #1 at ¶51).

The false statement at issue is the unsworn statement of Art Bell, who implicated Mr. Armstrong in Mr. Macmillan's death, the admission of which formed the basis of the reversal of Mr. Armstrong's conviction. Mr. Armstrong alleges that Art Bell and Lance Pough were "threatened and coerced into making various agreements with the prosecution relating to the Macmillan homicide investigation." (Docket #1 at ¶31). Mr. Armstrong also alleges that former defendant, Det. Gambill, "attempted to force Pough and Art Bell to provide false information" and former defendant, Lt. Bishop, prepared, created, or caused to be prepared false statements [and] false allegations[.]" (*Id*. at ¶45). Mr. Armstrong also states that Lt. Bishop "repeatedly accused Armstrong of killing McMillan *** ignored Amstrong's protests to the contrary" and "played upon race to achieve his objective." (*Id.* at ¶¶34, 36). Mr. Armstrong finally alleges that Lt. Bishop "subjected Armstrong to an unlawful custodial interrogation[.]" (*Id.* at ¶45). Mr. Armstrong alleges that Warren County Prosecutor, Mr. Watkins "knew directly of every illegal act committed by" Det. Gambill and Lt. Bishop. (*Id.* at ¶35).

### A. The Claims Against Warren County Prosecutor Watkins

Mr. Armstrong alleges that Mr. Watkins is liable in both his official and individual capacities for the conduct set forth above. Mr. Armstrong's claim against Mr. Watkins in his official capacity, as a county prosecutor, must fail because "county prosecutors, in the course of prosecuting crimes,

act as agents of the State and are immune from suits seeking money damages against them in their official capacities." *Elkins v. Summit County, Ohio*, 2008 WL 614805 (N.D. Ohio), citing *Boone v. Kentucky*, 72 Fed. Appx. 306, 307 (6th Cir. 2003) (holding that a §1983 suit against county prosecutors in their official capacities "is deemed to be a suit against the state and also barred by the Eleventh Amendment").

As for Mr. Armstrong's claims against Mr. Watkins in his individual capacity, Mr. Watkins alleges that Mr. Armstrong's complaint fails to state a claim because it fails "to specify what deprivation of a federally protected right arises from any specific conduct" of Mr. Watkins. *Leeds v. City of Muldraugh, Meade County, KY*, 174 Fed. Appx. 251, 255 (6th Cir. 2006). The undersigned disagrees. It is true that Mr. Armstrong's complaint is generally vague as to the specific conduct by Mr. Watkins that he alleges was improper; however, he does allege that Mr. Watkins improperly charged him with a crime that resulted in his conviction and a loss of liberty, thus, satisfying the minimal requirements to state a claim.

Mr. Watkins next alleges he is absolutely immune from civil liability. "Prosecutors generally enjoy absolute immunity for acts taken 'in initiating a prosecution and in presenting the State's case.'" *Vakilian v. Shaw,* 302 Fed. Appx. 350, 357 (6th Cir. 2008), *quoting Imbler v. Pachtman*, 424 U.S. 409, 431 (1976). Courts "use a 'functional' approach to determine when absolute immunity applies, looking to 'the nature of the function performed, not the identity of the actor who performed it.'" *Vakilian,* 302 Fed. Appx. at 357, *quoting Forrester v. White*, 484 U.S. 219, 229 (1988). When a prosecutor is charged with "[s]earching for clues and corroboration that might give [the prosecutor] probable cause to recommend that a suspect be arrested[,]" he is not protected by absolute immunity. *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). However, "the professional

evaluation of the evidence assembled by the police" is so protected. *Id.* "Absolute prosecutorial immunity will attach to administrative or investigative acts necessary for a prosecutor to initiate or maintain a criminal prosecution." *Ireland v. Tunis*, 113 F.3d 1435, 1446-47 (6th Cir. 1997). "The decision to file a criminal complaint and seek issuance of an arrest warrant are quasi-judicial duties involved in initiating a prosecution" that are also protected by absolute immunity. *Id.*

In *Imbler, supra*, the Court discussed the public policy behind prosecutorial immunity, stating that absolute immunity stems from a concern that without such immunity, "harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." *Imbler*, 424 U.S. at 423-24. The *Imbler* Court considered this policy when it noted with approval a Second Circuit Court of Appeals decision affirming the dismissal of a complaint against a prosecutor, based on absolute immunity. *Id.* at 422, *citing Yaselli v. Goff*, 12 F.2d 396, 399-404 (2nd Cir. 1926)(holding that even when it is alleged that a prosecutor "maliciously and without probable cause procured plaintiff's grand jury indictment by the willful introduction of false and misleading evidence[,]" the prosecutor is immune).

The conduct with which Mr. Watkins is charged merely relates to his judicial function. The case against Mr. Armstrong was prosecuted solely by Assistant Prosecutors, Jennifer Carroll Kirr, and David M. Toepfer. (Toepfer Aff. ¶5). Members of the Trumbull County Prosecutor's office at all times "engaged in prosecutorial functions relative to the murder indictment, prosecution, and conviction of Mr. Armstrong." (*Id.* at ¶14; Docket #25, Affidavit of Assistant Prosecutor. Monte J. Horton, at ¶14). Mr. Watkins merely "approved the indictment and prosecution of Mr. Armstrong. (Docket #24, Affidavit of Mr. Watkins, at ¶6). Mr. Watkins did not participate, in any way or

11

manner, in any proceedings or events leading to the indictment, prosecution, and conviction of Mr. Armstrong." *Id.* Mr. Watkins "was not made aware of any conduct of assistant prosecutors during events or proceedings leading to the indictment, prosecution, and conviction of Mr. Armstrong \*\*\* or subsequent thereto[,] that would cause Mr. Armstrong's civil rights to be violated" and has "never sanctioned or approved" of such conduct. (*Id.* at ¶7). Finally, even if the Det. Gambill's and Lt. Bishop's conduct was improper, Mr. Watkins had no "authority to compel personnel employed by the referenced police departments \*\*\* to conduct criminal investigations, including the questioning of witnesses an suspects, in a certain manner or by following specified procedures" and did not do so here. (*Id.* at ¶8). Thus, Mr. Watkins is absolutely immune and Mr. Armstrong's §1983 claim against him must fail.

### B. The Claims Against Trumbull County

Mr. Armstrong makes no direct claim against Trumbull County except to imply that the county is somehow liable for the acts of Mr. Watkins, a "maker of official policy." (Docket #1 at ¶51). Mr. Armstrong's claim against Trumbull County has no merit.

There is no vicarious liability under *respondeat superior* against a government entity for the acts of its employees. *Collins v. City of Harker Heights, Texas,* 503 U.S. 115, 120 (1992). Congress did not intend a municipality to be liable unless the action complained of was pursuant to official municipal policy, as established by custom, or policy including policy of deliberate indifference. *See, Collins,* 503 U.S. at 118; *Monell v. New York City Department of Social Services*, 436 U.S. 665, 691 (1978); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 477 (1986); *City of Canton v. Harris*, 489 U.S. 378 (1989); *Bd. of Cty. Comm. of Bryan Cty., OK v. Brown.*, 520 U.S. 397 (1997). "The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the

12

'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights" *Bd. of Cty. Comm.*, 520 U.S. at 404. An isolated incident by the police does not establish an official municipal policy. *Id.* at 405; *Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985). Even accepting Mr. Armstrong's allegations as true, they fail to demonstrate that the procurement of Mr. Bell's statement by Warren police, even if procured at the direction of Mr. Watkins, was due to a municipal policy or custom.

Based on the foregoing, it is recommended that summary judgment be granted in favor of Defendants as to Mr. Armstrong's first claim.

### 2. The 42 U.S.C. §1985 Claim

For his second claim, Mr. Armstrong asserts that "Defendants knowingly agreed to participate and join a scheme to deprive [him] of the rights afforded him by the Fourth, Fifth, and Fourteenth Amendments." (Docket #1 at ¶54). Mr. Armstrong maintains that "Defendants intentionally facilitated and acted in furtherance of the scheme to deprive" him of his constitutional rights. (*Id.* at ¶55).

To establish a claim under 42 U.S.C. §1985(3), "the plaintiff must allege and prove four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *United Bhd. of C & J v. Scott*, 463 U.S. 825, 828-29 (1983), *citing Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1971). "Conspiracy claims must be pled with some degree of specificity and ... vague and

13

conclusory allegations unsupported by material facts will not be sufficient to state such a claim." *Center for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 832 (6th Cir. 2007), *quoting Gutierrez v. Lynch*, 826 F.2d 1534, 1538-39 (6th Cir.1987).  Prosecutors are protected by the same absolute immunity rule discussed above for claims under 42 U.S.C. ¶1985(3).  *Coon v. Froehlich*, 573 F.Supp. 918, 920 (S.D. Ohio 1983).  *See also Vakilian*, 302 Fed.Appx. at 358 (finding that a prosecutor was entitled to absolute immunity from a §1985(3) claim because his decision to seek an arrest warrant was a "core prosecutorial decision").

Mr. Armstrong's complaint fails to allege with specificity the first, second, or third elements of a §1985(3) claim.  Mr. Armstrong fails to allege any specific facts to establish the alleged conspiracy, in which Mr. Watkins engaged to deprive Mr. Armstrong of the equal protection of the laws, or the facts demonstrating that Mr. Watkins acted in furtherance of such conspiracy. Even if the Court were to consider the conduct Mr. Armstrong cites in support of his first claim as meeting the specificity requirement, it is undisputed that Mr. Watkins "did not participate, in any way or manner, in any proceedings or events leading to the indictment, prosecution, and conviction of Mr. Armstrong" (Watkins Aff. ¶6), and that Mr. Watkins did not have the authority to compel any police action, and did not attempt to do so. (*Id*. at ¶8).

Mr. Watkins's conduct is this case consisted solely of approving the indictment and prosecution of Mr. Armstrong, a "core prosecutorial" function, and thus, Mr. Watkins is entitled to absolute immunity from Mr. Armstrong's 42 U.S.C. §1985(3) claim.  *See Vakilian*, 302 Fed. Appx. at 358.  Thus, there is no genuine issue of material fact to support a claim that Mr. Watkins conspired to deprive Mr. Armstrong of his civil rights.

14

As to Mr. Armstrong's claim against Trumbull County, even if a §1985(3) claim could be asserted against an entity,[3] Mr. Armstrong's complaint fails to allege directly or indirectly the elements of a §1985(3) claim against Trumbull County.  Further, as set forth above, there is no vicarious liability under *respondeat superior* against a government entity for the acts of its employees. *Collins* 503 U.S. at 120.

Based on the foregoing, it is recommended that summary judgment be granted in favor of Defendants on Mr. Armstrong's second claim.

### 3. State Law Claims

For this third claim, Mr. Armstrong asserts that the "defendants had actual knowledge of scheme to violate [his] constitutional rights" and with knowledge of said violations, "provided substantial assistance to the other defendants in perpetrating the violations."  (Docket #1 at ¶¶58-60). For his fourth claim, Mr. Armstrong asserts that "defendants maliciously instituted and continued" to prosecute him.  (Docket #1 at ¶63).  Both claims are intentional torts.

O.R.C. § 2744.02(A)(1) states in relevant part: "[e]xcept as provided in division (B) of this section, a political subdivision is not liable in damages in a civil action for injury, death, or loss to persons or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function."  However, the exceptions provided under R.C. 2744.02(B) are not applicable here because "there are no statutory exceptions to political subdivision immunity for intentional torts[.]" *Kammeyer v. City of Sharonville*, 311 F.Supp.2d 653, 661 (S.D. Ohio 2003).  Moreover, O.R.C. § 2744.02(B) operates "[s]ubject to sections 2744.03 and 2744.05 of the Revised Code."

---

[3] 42 U.S.C. §1985(3) refers to conduct by  "two or more persons."

15

O.R.C.. § 2744.02(B) (2000). Accordingly, O.R.C. § 2744.03 provides defenses to liability under O.R.C. §2744.02(B). One of these defenses, enumerated in O.R.C. 2744.03 at (A)(7), states that "t]he political subdivision, and an employee who is a county prosecuting attorney, city director of law, village solicitor, or similar chief legal officer of a political subdivision, an assistant of any such person, or a judge of a court of this state is entitled to any defense or immunity available at common law or established by the Revised Code."

Based on the foregoing, it is recommended that summary judgment be granted in favor of Defendants on Mr. Armstrong's third and fourth claims.

## III.  CONCLUSION

In view of the foregoing, and after reviewing the record as a whole, a rational fact-finder could not find for the nonmoving party, and accordingly it is recommended that Defendants' motion for summary judgment be granted and judgment entered in favor of Defendants, and against plaintiff, Shawn Armstrong, and that the case be dismissed with prejudice.



       /s/James S. Gallas
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of mailing of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

Dated: July 2, 2009